**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GENERAL ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-526-LPS |
| | ) | |
| VIBRANT MEDIA, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**GENERAL ELECTRIC COMPANY'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff*
*General Electric Company*

OF COUNSEL:

Matthew M. Wolf
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
(202) 942-5000

Nicholas H. Lee
ARNOLD & PORTER LLP
777 South Figueroa Street, Forty-Fourth Floor
Los Angeles, California 90017-5844
(213) 243-4000

Dated: June 14, 2013

# TABLE OF CONTENTS

Page

I.     THE NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

II.    SUMMARY OF ARGUMENT ............................................................................ 1

III.   STATEMENT OF FACTS .................................................................................. 1

    A.    Background Of The Technology ..................................................................... 1

IV.   CONSTRUCTION OF TERMS........................................................................... 2

    A.    Applicable Law................................................................................................. 2

    B.    Claim Terms At Issues ..................................................................................... 4

        1.     "Class Codes" / "Major Class Codes" ............................................... 4

        2.     "Preferred Major Class Codes" ........................................................... 6

        3.     "Hit Count Data" ................................................................................. 7

        4.     "Intermittent Maintenance Mode"....................................................... 8

        5.     "Wherein the character strings have no associated hypertext link(s)" ............................................................................................... 9

        6.     Means-Plus Function Claim Terms ..................................................... 10

            a.     "determining means"................................................................ 10

            b.     "querying means" ..................................................................... 12

            c.     "means . . . for providing [] anchor code(s)"............................. 14

            d.     "writing means . . . for writing a plurality of character strings into a primary computer file" ........................................... 15

            e.     "qualifying means" ('065 patent, claim 14) ............................... 17

            f.     "qualifying means" ('074 patent, claim 3; '065 patent, claim 17)................................................................................... 18

            g.     "interface means"...................................................................... 19

h.  "defining means" ...................................................................20

i.  "writing means" ...................................................................21

j.  "receiving means" / "transmitting means" ...................................21

k.  "assigning means" ...............................................................23

l.  "record keeping means" ........................................................24

7.  The Remaining Claim Terms Do Not Require Construction....................25

**V.   CONCLUSION ....................................................................................25**

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Andersen Corp. v. Fiber Composites, LLC,*
    474 F.3d 1361 (Fed. Cir. 2007)...................................................................25

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.,*
    262 F.3d 1258 (Fed. Cir. 2001)...................................................................25

*Biagro W. Sales, Inc. v. Grow More, Inc.,*
    423 F.3d 1296 (Fed. Cir. 2005).....................................................................4

*CCS Fitness, Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002).....................................................................3

*CollegeNet, Inc. v. ApplyYourself, Inc.,*
    418 F.3d 1225 (Fed. Cir. 2005).....................................................................3

*Comark Commc'ns, Inc. v. Harris Corp.,*
    156 F.3d 1182 (Fed. Cir. 1998).....................................................................3

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,*
    279 F.3d 1022 (Fed. Cir. 2002).....................................................................4

*ICU Med., Inc. v. Alaris Med. Sys., Inc.,*
    558 F.3d 1368 (Fed. Cir. 2009)...................................................................25

*JVW Enters., Inc. v. Interact Accessories, Inc.,*
    424 F.3d 1324 (Fed. Cir. 2005).................................................................3, 7

*In re Katz,*
    639 F.3d 1303 (Fed. Cir. 2011)................................................. 4, 10, 22, 23

*Lucent Techs., Inc. v. Extreme Networks, Inc.,*
    367 F. Supp. 2d 649 (D. Del. 2005) ...........................................................25

*Markman v. Westview Instr., Inc.,*
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ...........................1, 3

*MBO Labs., Inc. v. Becton, Dickinson & Co.,*
    474 F.3d 1323 (Fed. Cir. 2007).................................................................3, 7

*NeoMagic Corp. v. Trident Microsystems, Inc.,*
    287 F.3d 1062 (Fed. Cir. 2002).............................................................3, 6, 7

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................3, 4

*Renishaw PLC v. Marposs Societa' per Azioni,*
    158 F.3d 1243 (Fed. Cir. 1998)........................................................................3

*Typhoon Touch Techs., Inc. v. Dell, Inc.,*
    659 F.3d 1376 (Fed. Cir. 2011)..................................................................4, 10

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)........................................................................3

## I.    THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff General Electric Company ("GE") filed suit against Vibrant Media, Inc. ("Vibrant Media") on April 27, 2012 alleging infringement of U.S. Patent Nos. 6,092,074 ("'074 Patent") (D.I. 50-1) and 6,581,065 ("'065 patent") (D.I. 50-2) (collectively, "Patents-In-Suit"). (D.I. 1.)  A *Markman* hearing is currently scheduled for August 2, 2013.  (D.I. 14.)

## II.   SUMMARY OF ARGUMENT

The Patents-In-Suit are directed to methods and systems for automatically and dynamically providing hyperlinks for certain character strings in a computer file, *e.g.*, webpage, through the use of a particular relational database architecture, network layout, and programming logic.  GE's proposed constructions are consistent with the specifications' broad disclosure of a variety of embodiments and algorithms.  Vibrant Media, on the other hand, selectively imports limitations from the specification and/or improperly restricts its proposed constructions to a single embodiment to avoid infringement.  Indeed, while the vast majority of disputed terms have ordinary meanings well understood by those of skill in the art, Vibrant Media seeks to construe an additional 28 terms with proposed constructions that often parrot the claim language and add restrictions, such as "by a primary computer."  Vibrant Media's constructions also ignore the algorithms and source code disclosed in the specification for the means-plus-function limitations, remarkably finding all indefinite.  The Court should thus adopt GE's proposals.

## III.  STATEMENT OF FACTS

### A.    Background Of The Technology

In traditional web programming and hypertext linking, a web publisher would manually enter Hypertext Markup Language (HTML) code into a source file of a web page to associate web text to hyperlinks.  A publisher in essence was forced to hard-code an "anchor code" (a tag that a browser recognizes to associate web text with a destination address) in a web page's source file.  Hypertext linking could not be accomplished on an automatic or dynamic basis by matching, for instance, (a) the semantic content of the publisher's website and (b) the semantic content of candidate destination websites.  Thus, adding or removing hyperlinks generally or by

topic, or rearranging sections of a website on a regular basis, would require a burdensome effort of manually re-coding a source file.

The Patents-In-Suit[1] sought to lighten this burden by dynamically processing the text of a web page and determining what character strings, if any, should be converted into a hypertext link. This is accomplished, in part, on various networked servers, specialized functions, and relational databases. For example, the patents describe various databases that maintain and associate together certain data, such as matching character strings (*e.g.*, text of a website), class codes, destination addresses, expiration dates and hit count data. This can be accomplished in a number of ways, such as through database programming techniques, like SQL. (D.I. 50-1 at 4:7-13, 15:18-25, 16:67.) The programming logic used to analyze a given web page can entail a one-by-one processing or scanning of its raw text whereby each word or phrase is used to query databases for a matching character string and corresponding destination address. (*Id.*, 14-15:63-28.) Upon finding a match, the system can rewrite a webpage and insert an anchor code or URL associated with the matching character string. (*Id.*, 16:27-67.) The system also utilize class codes to control the number and type of corresponding destination addresses and prevent conflicts where the same character string might be used in different contexts. For example, the string "New York" may return different hyperlinks based on the context or subject area of a web page, *e.g.*, tourism versus sports. (*Id.*, 19:54-65.) Certain network configurations and synchronization methodologies are provided along with interfaces for administrator updates and tracking for web analytics. (*Id.*, 18-19:31-7, 21-22:54-34.) Combined, publishers can dynamically improve the accuracy of matching links without manually (re-)coding a page.

## IV. CONSTRUCTION OF TERMS

### A. Applicable Law

Claim construction is a matter of law and begins with the claim language itself, the patent

---

[1] The '074 patent was filed on February 10, 1998 and issued on July 18, 2000, while the '065 patent, which is a continuation of the application that yielded the '074 patent, was filed on November 2, 1999 and issued on June 17, 2003.

specification, and the prosecution history. *Markman v. Westview Instr., Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The words of the claims are paramount as they define the subject matter that the inventor intended to claim. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation."). There is a '"heavy presumption" that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted). This may be rebutted if the patentee provides a different meaning from the term's ordinary or customary meaning or disavows a particular interpretation during prosecution. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 & n.3 (Fed. Cir. 1998). The specification—of which the claims are a part—"is the single best guide to the meaning of the disputed term." *Phillips*, 415 F.3d at 1315. Within the specification, the inventors may "use a term in a manner either more or less expansive than its general usage in the relevant community, and thus expand or limit the scope of the term in the context of the patent claims." *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005).

While the specification is critical to understanding what the inventors claimed as their invention, the Federal Circuit has repeatedly warned against improperly importing limitations into the claim. *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007); *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) ("We do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment"). In fact, a claim construction that excludes preferred embodiments "is rarely, if ever correct and . . . require[s] highly persuasive evidentiary support." *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)). Thus, courts must walk a "fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Commc'ns, Inc. v. Harris*

*Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

Extrinsic evidence – such as expert testimony, technical dictionaries, treatises, etc. – that explains how one skilled in the relevant art would understand the technology, or provide context for the terms used in the relevant field, may also be referenced following the patent and prosecution history. *Phillips*, 415 F.3d at 1318; *Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005).

To determine the proper scope of means-plus-function limitations "identification of the function recited in the claim and a determination of what structures have been disclosed in the specification that correspond to the means for performing" the function is necessary. *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1032 (Fed. Cir. 2002). For computer-based means-plus-function claims, absent any possible narrower construction, the specification need only disclose a general purpose processor for certain fundamental functions (*e.g.*, receiving, storing and processing) achievable through a general purpose computer without special programming. *In re Katz*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). However, where a claim involves "a special purpose computer-implemented means-plus-function limitation," the specification should "disclose an algorithm" to program/implement the function, which can be described in a formula, prose, flow chart, or "any other manner that provides sufficient structure." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385-86 (Fed. Cir. 2011).

**B.    Claim Terms At Issues**

**1.    "Class Codes" / "Major Class Codes"**

| Term(s)/Phrase(s) | GE's Proposed Construction | Vibrant Media's Construction |
|---|---|---|
| class codes | codes that can designate or identify a particular context or subject area, or control the number and type of a destination address | codes that can designate or identify a particular subject area |
| major class codes | class codes that can designate or identify a particular context or subject area | no construction necessary |

GE's proposed constructions for "class codes" and "major class codes" are consistent

4

with the disclosures of the Patents-In-Suit.[2, 3]  GE submits that "class codes," the broadest of the

three terms at issue, are codes that can designate or identify a particular context or subject area,

or control the number and type of a destination address.  Indeed, the patents explain that class

codes can be "major" or "minor" – the former of which identifies a context or specific subject

area, and the latter of which controls the number and type of a destination address.  (*See* D.I. 50-

1 at 19-20:41-13 ("major class tourism . . . major class of sports" for linkable character string,

"New York"); *id.*, 13:43-48 ("The words and phrases may be related to specific subject areas,

such as business, sports, travel, books, compact discs, and so forth, by assigning class codes to

the various subject areas"); *id.*, 20:33-44 ("minor classes can be used to control the number and

type of a hypertext links which are provided for the matched character string in the article to be

annotated 405.  For example, if . . . minor classes "1" and "2" are selected, then two anchor

codes will be provided . . . a home page (class "1"), while the other . . . a stock quote page (class

"2").");  *id.*, 5:5-22 (class codes).[4]  The specification also illustrates this concept:

```
#Major Class Codes:
# 100 = business
# 200 = sports
#
# Minor Class Codes:
# 1 = home page
# 2 = stock quote
# 3 = news stories
# 4 = team scores
#
                                 Major    Minor
Character string                 Class    Class

Class(es)

Compaq                           100      2, 3
IBM                              100      1, 2, 3
International Business           100      1, 2, 3
 Machines
Merck                            100      2, 3
Micron                           100      2, 3
Viasat                           100      1, 2, 3
NFL                              200      1
National Football League         200      1
San Diego Padres                 200      1, 3, 4
```

(*See id.*, 18:2-30 ("one or more major and/or minor class codes may be associated with each

character string in the annotation database 535").)  Here, both "major class codes" and "minor

class codes" are defined.  The major classes identify a context or category, *e.g.*, "business" or

"sports," while the minor classes associate specific types of destination pages, *e.g.*, "home page"

or "stock quote," to a given character string.

---

[2] Class codes: '074 patent, claims 1, 7; '065 patent, claims 4, 25.
[3] Major class codes: '074 patent, claims 3-5, 9-11; '065 patent, claims 17, 38.
[4] For claim terms common across both patents, citations to the '074 patent also include the equivalent, corresponding passage in the '065 patent, and vice-versa, given that the two share a common specification.

There is no dispute between the parties that "class codes" include codes that define a subject area, but Vibrant Media's construction incorrectly stops there. In doing so, Vibrant Media conflates the term with "major class codes" and ignores at least the minor class codes explicitly described in the patents. Indeed, that Vibrant Media offers no construction for the narrower term "major class codes" contradicts the specific and deliberate use of the phrase in the specification. (*Id.*, 18:2-30; 19-20:41-13.) This is legally improper. *NeoMagic*, 287 F.3d at 1074.

### 2. "Preferred Major Class Codes"

| GE Proposed Construction | Vibrant Media's Proposed Construction |
|---|---|
| major class code that is desired so as to bypass matching linkable character strings with other major class codes | desired major class code selected by administrator input on the primary computer |

"Preferred major class codes"[5] as used in the Patents-In-Suit are those desired major class codes that facilitate the bypass of matching linkable character strings with other major class codes. As explained above, "major class codes" can define different contexts or subject areas for a given character string to prevent the inappropriate link to matching character strings outside that context or subject area. (*See* § IV.B.1, *supra*; *see also* D.I. 50-1 at 19:50-65.) A preferred major class code simply associates a desired context or subject area to a particular character string so "matching linkable character strings with other major class codes are bypassed." (*See id.*, 20:3-13.)

Vibrant Media's construction focuses on the designee (*e.g.*, administrator) of a major class code as opposed to the function or use that the term defines. More specifically, Vibrant would have this Court read in a requirement that a preferred major class code must be designated "by administrator input on the primary computer." But, the evidence it relies upon makes clear that this is only a preferred option. (*See id.*, 20:3-13 ("content server administrator input 530 *is preferably used* to select which major class code of the matching linkable character string is desired.") (emphasis added).) And, to even limit the term to a primary computer contravenes the specification disclosures, which also describes an input interface on a central server with master

---

[5] The term is found in '074 patent, claims 3-5, 9-11 and '065 patent, claims 17-19, 38-40

annotation information that can be updated.  (*See* Fig. 5; D.I. 50-1 at 14:16-20 (input 590); *id.*,

13:33-48.)  To agree with Vibrant Media's construction is to improperly limit the term to a

preferred embodiment.  *See MBO Labs.*, 474 F.3d at 1333; *JVW Enters.*, 424 F.3d at 1335.

### 3.     "Hit Count Data"

| GE's Proposed Construction | Vibrant Media's Proposed Construction |
|---|---|
| data representing the number of times a hypertext link or destination address associated with a linkable character string is activated | data representing a count of all the visitors to an organization's website |

GE submits that "hit count data"[6] represents the number of times a hypertext link or

destination address associated with a linkable character string is activated.   This includes when a

destination address tied to a linkable character string is ultimately clicked by a web user (D.I. 50-

1 at 4:39-41, 14:5-9, 21:4-20, 21:25-29, 22:7-34), as well as upon retrieval and association of a

destination address corresponding to a linkable character string.  (*Id.*, Fig. 7; *id.*, 22:59-64 ("The

script on the central server also formats hit counts for billing and marketing purposes. . . .

Moreover, the central server can gather link hit data even for hits to non-preferred destination

addresses, if desired."); *id.*, 23:5-8 ("At box 710, if a fresh destination address is found, a hit

count is formatted for billing and marketing purposes at box 715, and the destination address and

expiration date data are transmitted to the content server at box 720"); *id.*, 23:17-20 (updating hit

count after destination address found in search engine result).)

Vibrant Media attempts to limit the construction to a count of all visitors to an

organization's web site.  This interpretation is far too narrow.  Its proposed construction fails to

account for logging when a destination address is found for a particular character string, as

explained above.  Moreover, claim 9 of the '074 patent and claims 20 and 41 of the '065 patent

mention nothing about "websites."   In fact, the claims refer to destination addresses, which may

designate a web page, but is not necessarily limited to it, and which can be referenced by blank

anchor codes not tied to a particular website address.  (*See* D.I. 50-1 at 11:15-17 ("Destination

Address – a variable that designates the location of a network resource *such as* a Web page; *may*

---

[6] This term is found in claim 8 of the '074 patent and claims 20 and 41 of the '065 patent.

take the form of a URL.") (emphasis added); *see also id.,* 20:25-32 ("it is still possible to insert an anchor code which references a blank space in the destination database 540 which may subsequently be provided with an address.").)  The Court should thus adopt GE's proposed construction for "hit count data."

### 4.    "Intermittent Maintenance Mode"

| GE's Proposed Construction | Vibrant Media's Proposed Construction |
|---|---|
| mode for communicating and updating data at fixed or varying intervals | an operational state of a computer in which the state is switched to maintenance mode from another state periodically |

GE's proposed construction for "intermittent maintenance mode" maps to the language and disclosures found in the Patents-In-Suit.   Claims 9 of the '074 patent and claims 12-13, 21, 33-34, and 42 of the '065 patent all recite updating or transmitting either character strings or destination addresses via a communication network in an intermittent maintenance mode.  The specification explains that this can occur "at fixed or varying intervals," such as on a daily, weekly, or even on an unprompted and automatic basis.  (*See* D.I. 50-1 at 11:25-39 ("central server 450 operates in maintenance mode wherein it intermittently updates each content server with particular ones of character strings and destination addresses, e.g., on a daily or weekly basis.  The intermittent update may be at a fixed or varying intervals."), 20-21:63-3 ("destination addresses and expiration date data are transmitted from the central server 450 to the content server 410 and to other content servers, not shown, intermittently on an unprompted basis, or in real-time if requests by a particular content server."), 24:14-19 ("central server intermittently updates each content server with new character strings and/or destination addresses, and also receives new character strings from the content server.  This may be done automatically on an off-line basis, e.g., without requiring input from the content server administrators").)

Notably, Vibrant Media fails to identify any intrinsic evidence to support its proposed construction (D.I. 50 at 3), which raises more questions than the specification or knowledge of one of ordinary skill in the art can answer – *e.g.*, what is "another state"?;  what is the scope of

"periodically"?; what is "an operational state"? The Court should thus adopt GE's proposed construction.

### 5. "Wherein the character strings have no associated hypertext link(s)"

| GE's Proposed Construction | Vibrant Media's Proposed Construction |
|---|---|
| wherein the character strings are not already assigned a hypertext link(s), or are not themselves a hypertext link(s), which can be automatically linked to a web site by software, such as email or a word processor | wherein the article that is being annotated contains no character strings with hypertext links at deployment of the computer system (claim 1) / instrumentality (claim 22) |

This phrase appears in the preamble of claims 1 and 22 of the '065 patent. It was first added through amendment prior to examination of the '065 patent application in view of a prior art reference (U.S. Patent No. 5,751,961 (Smyk)) cited against the '074 parent patent. (D.I. 50-3, Nov. 2, 1999 Amendment at 1-3.) The patentee remarked:

> Note that Smyk uses translation of logical addresses, or hypertext links, to physical addresses. *In other words, every example and application in Smyk deals with an initial link that can be mapped to a different address. This is useful, for example, in routing requests for data to different "mirrored" sites.* Smyk also provides for "vanity" hypertext links or URLs, etc. In each example and application of Smyk, an initial address can be mapped to a different address. *Nowhere in Smyk is it disclosed that a "base" character string previously having no associated hypertext link can be mapped to a hypertext link.* Smyk's goal is very different that of the present invention. Thus it is no surprise that Smyk does not disclose, nor make obvious, the present invention.

(*Id.* at 3 (emphasis added).) Smyk described a system that processed pre-existing logical addresses and translated them into a physical address for the browser to use in the normal retrieval of a web page. (*See* Ex.[7] A at Abs., Fig. 4, 2:18-35, 6:38-57.) In contrast, the patentee here made clear that the linkable character strings at issue here were not already mapped to or associated with a hypertext link by the system. The Examiner confirmed this understanding by stating that the prior art of record "did not address 'wherein the character strings have no associated hypertext link,' which is taken, as an example, to preclude such strings as www.pegasus.com, which automatically linked to a web site by some software, such as email or

---

[7] "Ex." refers to exhibits attached to the Declaration of Nicholas H. Lee In Support Of General Electric Company's Opening Claim Construction Brief.

a word processor." (D.I. 50-3, June 15, 2001 Notice of Allowability at 2.) GE's proposed construction flows directly from these intrinsic statements and should be adopted.

Vibrant Media, on the other hand, seeks to arbitrarily and improperly narrow the term to require that no character string in a web page contains a single hypertext link "at deployment of the computer system (claim 1) / instrumentality (claim 22)." This restriction is divorced from the intrinsic record and means that a web page with pre-existing, hard-coded hypertext links would automatically fall outside the scope of the claims. Such a construction should be rejected as it is contrary to the disclosures of the patent. (*See* D.I. 50-2 at 15:51-54 (words or phrases can already have conventional hyperlinks).)

### 6. Means-Plus Function Claim Terms

The necessary specification disclosure for computer-implemented means-plus function limitations depends on whether the claimed function can be performed by a general-purpose computer directly, or if special programming is required in order to implement the function. Where the claimed function can be performed by a general-purpose computer, disclosure of a general-purpose processor to perform the function is sufficient. *Katz*, 639 F.3d at 1316. However, functions in need of specially-programmed computers require the disclosure of an algorithm to perform the claimed function. *Typhoon Touch Techs.*, 659 F.3d at 1385-86. Algorithmic disclosures may be in any form sufficient to inform one of ordinary skill in the art, including source code, a mathematical formula, prose, or a diagram. *Id.* Contrary to Vibrant Media's positions, the patents disclose sufficient structure for the means-plus function limitation at issue.

### a. "determining means"

Claims 1 and 3 of the '074 patent and claim 1 of the '065 patent recite the function of "determining a matching linkable character string for said first character string, if present, in said annotation database." The disclosed structure to perform this function is a properly programmed computer, as guided by the patents.

The specification describes an "Intelligent Annotator™" as "software that provides dynamic hypertext for an article to be annotated [that] may be implemented as a state machine at each content server." (D.I. 50-1 at 11:12-14.)   It works to "process[] an on-line text article [] to automatically associate hypertext anchor codes with various character strings" and can do so for "character strings in the on-line article [] which match a local database of stored character strings." (*Id.*, 12:31-47; *see also id.*,14:25-27 ("Computer information regarding the article to be annotated is processed by the Intelligent Annotator").)   In fact, the patents explain that those servers with Intelligent Annotator™ can include "an annotation database." (*Id.*, 14:21-22.)

The particular methodology disclosed in the patents for processing the text of an online article to determine a matching linkable character string is straight forward:  compare one character at a time with the character strings from the annotation database to build a Discrete Finite Automata (DFA) with a terminal state indicating that a matching character string in the annotation database has been found. (*Id.*, 14-15:66-17; *see also id.*, 15:36-38 ("The Intelligent Annotator™ traverses the text of the article.  That is, each word or phrase is examined to determine whether the text should be converted to hypertext."), 17-18:63-33 ("a mechanism is required to determine which character strings (e.g., words or phrases) in the article to be annotated 405 are actually annotated, e.g., provided with a hypertext.  The annotation database 535 achieves this goal by storing a list of character strings [in the annotation database]. . . . The Intelligent Annotator™ compares each character string in the article to be annotated 405 [to] the character strings in the annotation database 535 to see if there is a match."), 19:8-14 ("if a match is found between a current character string of the article to be annotated 405 and the character strings in the annotation database 535, the Intelligent Annotator™ 520 inserts an anchor code into the article to be annotated 405 to associate the matched character string with a corresponding destination address in the destination and expiration database 530.").)  The patent further explains that known relational database techniques, such as Structured Query Language (SQL), can be used. (*See id.*, 16:60-67, 15:22-25.)

Thus, given these disclosures, a person of ordinary skill in the art would understand how

to implement the recited function on the system servers.  (Taylor Decl.[8], ¶¶ 21-27.)

### b. "querying means"

This phrase appears in claim 1 of the '074 patent and claims 2, 4 and 23 of the '065 patent, which claim the function of "[querying] said destination database to obtain" destination addresses, whether corresponding to a linkable character string or associated class code.[9]  The corresponding structure to perform this function is a computer properly configured and programmed according to the specification disclosures.

The specification explains that various servers contain destination databases that can be queried.  (*See* D.I. 50-1 at Abs., Figs. 4-5.)  In fact, when a given server does not contain a valid destination address for a character string locally in its database, it queries a destination database on another server for corresponding destination addresses for that character string.  (*See* D.I. 50-1 at Abs., 24:20-24; D.I. 50-2 at 4:38-44 ("each content server can query the central server on a real-time basis to obtain a destination address for a character string which has no valid corresponding destination address at the content server.  The central server responds to such queries by searching its master databases, and using a search engine if required, to obtain a destination address.").)  It does so using a combination of the Intelligent Annotator™, which processes online articles and inserts hypertext links or anchor codes for a given character string, and the Dynamic Decision Filter™, which obtains a destination address for those character strings.  (*See* D.I. 50-1 at 11:5-14, 16-17:60-55.)   Both are clearly linked to servers in the system.  (*Id.*, 11:5-8, 14:21-25; Figs. 4-5.)

As described in the specification, the "Intelligent Annotator™ compares each character

---

[8] "Taylor Decl." refers to the Declaration of Richard N. Taylor In Support Of General Electric Company's Opening Claim Construction Brief.

[9] Claim 1 of the '074 patent and claim 4 of the '065 patent recite the function of "[querying] said destination database to obtain the plurality of destination addresses corresponding to the associated plurality of class codes," while claims 2 and 23 of the '065 patent require "querying said destination database to obtain said at least on destination address corresponding to said matching linkable character string."

string in the article to be annotated [to] the character strings in the annotation database [] to see if there is a match." (*Id.*, 18:2-55.) Once a match is found, whether on a central or content server database, the "Intelligent Annotator™ inserts an anchor code into the article to be annotated 405 to associate the matched character string with the corresponding destination address in the destination and expiration database." (*Id.*, 19:8-14.) This HTML anchor code references a script of the Dynamic Decision Filter™, which points to a destination address for a particular character string. (*See id.*, 17:4-55 ("'/cgi-bin/sw?t=Wall+Street&c= home.' This anchor code references a directory 'cgi-bin' of source code used by the Intelligent Annotator™ 520. Additionally, 'sw' references Part A of the Dynamic Decision Filter™, thereby launching the corresponding script, while 't=' precedes the applicable text (e.g., Wall Street), and 'c=' precedes the applicable minor class (e.g., home), discussed below. This source code may be written in C++ or any other suitable programming language, and stored on the content server 410. . . . Additionally, within the directory 'cgi-bin', the character string "Wall Street" references a destination address, which is a home page for Wall Street, e.g., 'http://www.wallstreet.com'.") As described with respect to the process flow diagrams of Figures 6 and 7, the Dynamic Decision Filter™, which can be written in Practical Extraction and Reporting Language (PERL), determines the destination page for the hyperlink. (*Id.*, 21:54-64.) To do so, a local content server's destination database is queried for a fresh or unexpired destination address whereby any match is immediately sent to the user's browser. If there is no match, the script calls another function that attempts the same query on the central server's destination and expiration databases (or synthesizes search engine results for a character string into a single destination address) and sends that to the local server.[10] (*Id.*, 21-22:54-23; 22:35-41; 22-23:65-4; Figs. 6-7.) The patent further indicates that the querying to accomplish this can be done using relational database programming techniques

---

[10] The same logic applies whether querying destination databases for corresponding destination addresses associated to character strings (claims 2, 4, 23 of the '065 patent) or class codes (claim 1 of the '074 patent) given that class codes are optionally associated to linkable character strings to bypass certain destination addresses outside a desired subject area or type. (*See* D.I. 50-1 at 19-20:65-25; 19:41-42, 19:50-53.)

known in the art, such as Structured Query Language (SQL), which include standard functions to retrieve stored data. (D.I. 50-1 at 4:7-13; Taylor Decl., ¶¶ 35-37; Ex. C.) These disclosures thus sufficiently describes how the function is implemented. (Taylor Decl., ¶¶ 28-37.)

### c. "means . . . for providing [] anchor code(s)"

Claim 1 of the '074 patent and claims 3 and 4 of the '065 patent recite the function of "providing [] an anchor code(s) which relates said matching linkable character string to said corresponding [] destination address(es) to provide a [] hypertext link(s) for said first character string." The corresponding structure to perform this function is a computer properly configured and programmed according to the specification disclosures.

The patent is explicit in that the "Intelligent Annotator™ provides an anchor code which references a destination address in the destination and expiration database 540." (D.I. 50-1 at 14-15:66-28; *see also id.*, 12:31-34 ("The content server 410 processes an on-line text article 405 using an executable Intelligent Annotator™ 412 to automatically associate hypertext anchor codes with various character strings in the article."); *id.*, 11:12-14, 12:43-47; Figs. 4-5.) This anchor code can be "associated with the matching character string" by having them "inserted into the article to be annotated 405 next to the matching character string" or "using relational database techniques, such as [] SQL." ('074 patent, col. 14-15:66-28; *see also id.* 3-4:65-13 ("anchor code and/or destination addresses may be associated with particular character strings using relational database programming techniques, such as Structured Query Language (SQL).").) Indeed, the patents provide exemplary code showing how the Intelligent Annotator™ provides an anchor code for a given matching character string:



(D.I. 50-1 at 16:27-67 (showing sample HTML code in "annotated article 415 output from the Intelligent Annotator™ 520" and explaining that the "term <a> is HTML which designates a

hypertext anchor. The Intelligent Annotator™ 520 associates anchor codes and corresponding destination addresses with the matched character string. . . . the Intelligent Annotator™ 520 inserts anchor codes into the annotated article 415 to identify the corresponding destination address in the destination and expiration data base 540. Alternatively, relational database techniques may be used."); *see also id.*, 14-15:66-28 ("Upon receipt of an article to be annotated, the Intelligent Annotator™ scans the file to determine matching strings from the annotation database 535. . . . Each character string in the article to be annotated 405 may be referenced according to a bit count position, and the anchor code may be associated with a particular character string according to the corresponding bit count.").)[11] A person of ordinary skill in the art would understand this to be sufficient algorithmic disclosure. (Taylor Decl., ¶¶ 38-43.)

> **d.** **"writing means . . . for writing a plurality of character strings into a primary computer file"**

Similar to the providing means highlighted above, the "writing means" in claim 2 of '074 patent and claim 5 of the '065 patent is clearly linked to a properly configured and programmed computer according to the specification disclosures.[12] More specifically, the Intelligent Annotator™, executed on system servers, "inserts an anchor code into the article to be annotated to associate the matched character string with the corresponding destination address in the destination and expiration database []." (D.I. 50-1 at 19:8-14; *id.*, 11:12-14 ("Intelligent Annotator™ – software that provides dynamic hypertext for an article to be annotated; may be implemented as a state machine at each content server"); *id.*, 12:31-34.) In fact, once the "Intelligent Annotator™ 520 processes the computer information regarding the article to be

---

[11] The system can also provide a plurality of anchor codes as explained in the patent. (*See* D.I. 50-1 at 16:19-26 ("When two or more hypertext links are provided for a character string in the article to be annotated 405, the two or more corresponding hypertext words can be inserted immediately after the character string. When only one hypertext link is provided for a character string, the character string itself can become the hypertext. However, for one hypertext link, it is also possible to insert a hypertext word or words (e.g., "home") which describes the link.").)

[12] The function recited in the writing means of '074 patent claim 2 and '065 patent claim 5 is "writing a plurality of character strings into a primary computer file in which said first character string is carried to identify the corresponding plurality of hypertext links for said first character string."

annotated," it can "output a discrete annotated article," which "may be a new computer file, or a computer file which is a re-written version of the article to be annotated[]." (*Id.*, 14:41-51.) The patent goes so far as to provide sample code to demonstrate precisely how to write character strings into such a computer file to identify hypertext links:



The left text is the original, pre-annotated article (*id.*, 15:29-47), while the right is the annotated article as viewed by a web user. (*Id.*, 15:48-66.) The underlying HTML code outputted by the Intelligent Annotator to produce this annotated article is shown as follows:

(*Id.*, 16:27-67 ( "The annotated article 415 output from the Intelligent Annotator™ 520 may be provided using the following HTML: (see above) . . . The term <a> is HTML which designates a hypertext anchor . . . In one embodiment, the Intelligent Annotator™ 520 inserts anchor codes into the annotated article 415 to identify the corresponding destination address in the destination and expiration data base 540. Alternatively, relational database techniques may be used."); *see also id.*, 14-15:63-28; *id.*, 17:1-43 ("anchor code for the character wall street is: 'cgi-bin/sw/?t=Wall+Street&c=home'. This anchor code references a directory 'cgi-bin' of source code used by the Intelligent Annotator™ 520. Additionally, 'sw' references Part A of the Dynamic Decision Filter™," which obtains a corresponding destination address.) As illustrated, the system can also write a plurality of character strings and associate them with one or more destination addresses. (D.I. 50-1 at 16:19-26.) Taken together, the specification provides

sufficient structure and algorithm for a person of ordinary skill in the art to implement the recited function.  (Taylor Decl, ¶¶ 44-52.)

     **e.**   **"qualifying means"** ('065 patent, claim 14)

   Claim 14 of the '065 patent requires means associated with a destination database for "qualifying said at least one corresponding destination address according to an expiration date associated therewith."  The specification explains that destination addresses and associated expiration date data can be stored in local and central databases in a variety of ways.  (D.I. 50-2 at 21:46-55.)  And, when expiration date data is used as a qualification criteria, the patent explains how the system components, such as the Dynamic Decision Filter™, obtain "fresh" or "non-stale" destination addresses – *e.g.*, find a matching destination address for a given character string; check the associated expiration date data; assess whether the destination has expired or become "stale"; if stale, query a master destination and expiration databases to obtain a new, valid destination address.  (*See id.*, 13:7-10 ("The content server 410 may need to contact the central server 450 even if a matching destination address is found for a particular character string, for example, if the matching destination address has expired and therefore may be 'stale'."), 13-14:52-6 ("Expiration dates may be assigned to the destination addresses by the central server 450 so that a new destination address is obtained for a particular character string upon the expiration of the old destination address.  For example, an expiration period of ninety days may be used. Expiration date data may designate a particular calendar date, or may indicate a countdown period.").)  In describing the process flow of Fig. 6, the patent explains that the Dynamic Decision Filters, executed on system servers, "first queries the local content server's destination and expiration database" through its CGI script and determines "[i]f a fresh (i.e., unexpired) destination is found."  (*Id.*, 21-22:62-41.)  While a fresh destination (*e.g.*, a URL) is sent directly to the requesting browser, an expired destination address prompts the script to request a new destination address and expiration date from the databases associated with a central server.  (*Id.*; *see also* Figs. 6-7; *id.*, 23:5-15 ("As shown in FIG. 7, at box 700, a new destination address and expiration date are requested by a content server. At box 705, the master

destination address and expiration database at the central server is queried using a character string received from the content server. The querying step is responsive to data in the destination address and expiration date database, as indicated at box 708."); *id.*, 22:54-60.)[13] Given these disclosures and the knowledge of one of skill in the art with respect to database programming techniques the specification sufficiently describes the structure and algorithm necessary to perform the recited function. (*See* Taylor Decl, ¶¶ 53-60.)

        **f.**      **"qualifying means"** ('074 patent, claim 3; '065 patent, claim 17)

Claim 3 of the '074 patent and claim 17 of the '065 patent require means associated with the annotation database for "qualifying the matching linkable character string according to qualification criteria" matching an associated major class code to a preferred major class code. The corresponding structure to perform this function is a computer properly configured and programmed according to the specification disclosures.

The Intelligent Annotator™, executed on system servers, processes online text articles to identify and qualify linkable character strings on a computer file based on entries in an annotation database and then associates those strings with a destination address. (D.I. 50-1 at 12:28-61, 11:12-14, 17-18:63-33.) Indeed, the patents explain that the Intelligent Annotator™ "correlate[s] entries in the database using any of several well known matching algorithms" and first "scans the [computer] file to determine matching strings from the annotation database" by building a Discrete Finite Automata (DFA) "whose terminal state is a matching character string in the annotation database [] found in [that file]." (*Id.*, 14-15:63-16.) Moreover, the linkable character strings in the annotation database can also be related to "specific subject areas . . . by assigning class codes to various subject areas." (*Id.*, 13:43-48.) In fact, the patents provide an exemplary illustration of the annotation database in such an embodiment (*id.*,17-18:63-33):

---

[13] Expiration dates associated with destination addresses enable the system to give preferential treatment to certain links based on advertising contracts. In other words, a given destination address can be replaced with a link to the next preferred advertiser by having an expiration date for the first link match the expiration date of its advertising contract. (D.I. 50-2 at 23-24:59-8.)

```
#Major Class Codes:
# 100 = business
# 200 = sports
#
# Minor Class Codes:
# 1 = home page
# 2 = stock quote
# 3 = news stories
# 4 = team scores
#
```

| Character string | Major Class | Minor Class |
|---|---|---|
| Class(es) | | |
| Compaq | 100 | 2, 3 |
| IBM | 100 | 1, 2, 3 |
| International Business Machines | 100 | 1, 2, 3 |
| Merck | 100 | 2, 3 |
| Micron | 100 | 2, 3 |
| Viasat | 100 | 1, 2, 3 |
| NFL | 200 | 1 |
| National Football League | 200 | 1 |
| San Diego Padres | 200 | 1, 3, 4 |

The specific logic that can be used to qualify a linkable character strings with major class codes is then described – *i.e.*, select a desired major class code associated with a particular subject area and assign it to a particular character string in the annotation database; and then, when processing an online article using the Intelligent Annotator to search for a matching linkable character string in the annotation database, check, not only that the character string exists in the annotation database, but also that the preferred major class code exists in that entry as well. (*Id.*, 17-18:63-33, 19-20:41-50.) The patent further illustrates this logic with several examples – *e.g.*, if a major class code 200 (indicating a "sports" subject area) is selected and the string "IBM" on a web page exists in the annotation database, it will not be returned as a match because the associated major class code for "IBM" is 100, which does not match the selected or desired major class code (200).[14] (*Id.*, 19-20:41-50.) Based on these disclosures, and the knowledge of one of ordinary skill in the art with respect to relational database techniques, the patents sufficiently describe the corresponding structure and algorithm for implementing the recited function. (*See* Taylor Decl., ¶¶ 61-71.)

### g. "interface means"

The interface means for receiving an administrator input as recited in claim 4 of the '074 patent and claims 7, 18 and 21 of the '065 patent facilitates the designation of preferred major class codes and linkable character strings. This is clearly linked to a computer properly configured and programmed according to the specification disclosures.

---

[14] Likewise, with the string "New York," a major class code related to sports or tourism will return different destination addresses. (D.I. 50-1 at 19:41-65.)

The patents describe a graphical user interface for receiving administrator inputs, which is associated with system servers. (*See* D.I. 50-1 at 5:29-34, 14:21-40; Fig. 5 (items 530, 590).) As required in the claims, this input permits an administrator to specify character strings and preferred major class codes associated with character strings. (*See id*., 5:29-34 ("a content server administrator may select particular words to be linked if it is expected that the particular word is not already in the annotation database); *id.*, 19-20:66-13 ("content server administrator input 530 is preferably used to select which major class code of matching linkable character strings is desired.").)[15]

To implement the administrative designation of character strings and class codes, the patent describes the necessary guidelines or methodology to one of ordinary skill in the art – *e.g.*, if a character string does not match an entry in the annotation database, highlight the particular character string on the page through the user interface shown on a display (*id.*, 18:31-43); determine to what subject area a character string relates and then select the corresponding major class code for that subject area and update the annotation database. (*Id.*, 19-20:66-13, 18:8-30 (illustrating the relationship between character strings and major class codes).) A sufficient level of algorithmic disclosure to program the computers running the graphical user interfaces is thus provided. (*See* Taylor Decl., ¶¶ 72-78.)

### h. "defining means"

Similar to the designation of linkable character strings through an interface means, the system servers can define a plurality of linkable character strings that are subsequently stored in the annotation database.[16] As shown in Figure 5, a central server contains a "content server administrator input" whereby new character strings can be defined. (*See* D.I. 50-1 at 5:29-34;

---

[15] *See also* D.I. 50-1 at 14:3-20 ("the central server administrator . . . updates the master annotation database 560 and master destination and expiration database 555 via input 590."); *id.*, 18:31-43 ("The content server administrator input 530 may be used to specifically request that a particular character string be linked").

[16] Claim 9 of the '074 patent recites defining means associated with said central computer for defining a plurality of linkable character strings.

*see* § IV.B.6.g (interface means), *supra*.)  Moreover, the central server can receive from content servers new character strings highlighted on a display through such administrator input and store such character strings in its master annotation database.  (*Id.*, 4:26-31 (central server "receives new character strings from the content server"), 11:18-54, 13:33-48.)  Given that the patent provides an illustration of the annotation database and explains that relational database programming techniques, such as SQL, can be utilized, a person of ordinary skill in the art would understand how to program a central server to process and define such new character strings in its annotation database.  (*See, e.g.*, *id.*, 18:5-30, 4:7-13; Taylor Decl., ¶¶ 79-83.)

<div align="center">

**i.      "writing means"**

</div>

The means recited in claims 7, 12 and 13 of the '065 patent require writing linkable characters strings and destination addresses to a database in various configurations.  Particularly, writing linkable character strings (designated by an administrator input or received from a central computer) to the annotation database (claims 7, 12) or writing destination addresses (received from a central computer) to the destination database (claim 13).  These functions are clearly linked to system computers described in the patent and achieved by a particular querying language and methodology.   For instance, when a server administrator selects a particular word to be linked, that word is written to the annotation database, an example of which is illustrated in the patent.  (D.I. 50-2 at 5:36-46, 11:24-46, 18-19:10-15, 23:33-39.)   And, while "a central server maintains a master database of specific words or phrases [] as well as a database of corresponding destination addresses," it can update the databases on content servers with the same information.  (*Id.*; *also id.*, 13-14:42-11, 17:49-67; 21:4-11.)  These actions can be performed through "relational database techniques" known in the art as suggested in the patents, such as SQL, which include "UPDATE" and "INSERT" as reserved functions for manipulating and writing to database tables.  (*See* Taylor Decl., ¶¶ 84-89.)

<div align="center">

**j.      "receiving means" / "transmitting means"**

</div>

Generally, in computer-implemented means-plus function claims, as is the case here, "receiving," and by extension "transmitting," can be done by any general purpose computer

without special programming.[17] *See Katz*, 639 F.3d at 1316 (concluding that "[the functions] 'processing,' 'receiving,' and 'storing' . . . can be achieved by any general purpose computer without special programming"). Indeed, as recited in the claims, the basic functions at issue here are receiving and transmitting a signal or data via a communication network. (*See* D.I. 50-1, claims 5, 9; D.I. 50-2, claims 12-13, 19-21.) These are fundamental computer operations of any general purpose computer as understood by one of skill in the art at the time of invention. (Taylor, Decl. ¶¶ 90-93; Ex. B at 8, 12-13, 15-16, 94.) The specification thus, at a minimum, must clearly link a "general purpose [computer] that performs the function." *Katz*, 639 F.3d at 1316; *see also id.* (holding that "'receiving' [is] coextensive with the structure disclosed, *i.e.*, a general purpose processor," which does not violate "the rule against purely functional claiming"). The specification here discloses precisely this link:

> A server, or file server, refers to a computer system with data storage that allows different users to access the data storage via a computer network. In a client-server interaction, a client forwards a file request. The server accepts the client's request, performs the associated operation (e.g., open, close, read, write, or seek), and returns a response to the client.
>
> Additionally, while the invention has been described for use in connection with the Internet, the invention may be adapted or use with virtually any computer network, including intranets, local area networks, and wide area networks.

(D.I. 50-1 at 13:13-42, 24:43-46.) In fact, Figure 4 illustrates the relationship between system components for receiving and transmitting data and signals, such as hit count data, character strings, destination addresses, expiration date data, and class codes:



FIG. 4

---

[17] Receiving means: '074 patent, claims 5, 9; '065 patent, claims 12-13, 19. Transmitting means: '074 patent, claim 9; '065 patent, claims 20-21.

The patent explains that such data and signals can be transmitted and received between the various servers and computers (*e.g.*, central and content servers) illustrated above "via a conventional communication network," such as the Internet. (D.I. 50-1 at 11:18-39, 12:28-31, 13:13-18; D.I. 50-2 at 24:12-34.)[18] This is precisely as framed in the claim language. (*See, e.g.*, '074 patent, cl. 5 and '065 patent, cl. 12-13, 19 ("receiving . . . *from a central computer* via a communication network"); D.I. 50-2, cl. 20-21 ("transmitting . . . *to a central computer* via a communication network") (emphasis added).)[19] The recited function can thus be accomplished through traditional network protocols as described and the corresponding processing of a general purpose computer. (Taylor Decl., ¶¶ 90-96.)

### k. "assigning means"

As required in claim 9 of the '074 patent,[20] the patent describes two ways in which destination addresses are assigned or associated with a linkable character string: (1) through inputted administrator designations; or (2) by querying a search engine with the character string or related terms. Both methods are clearly linked to a central computer. (*See* D.I. 50-1 at 7:6-10, 7:45-49, 11:5-9, 11:40-67, 13-14:49-20; Fig. 5.) Indeed, the databases of the central server maintain a listing of character strings and corresponding destination addresses, which can be distributed to other system servers. (*Id.*, 11:18-25, 13:3-18, 12-13:43-2, 18-19:51-7.)

Part B of the Dynamic Decision Filter 545, executed on the central server, handles

---

[18] *See also* D.I. 50-2 at 7:41-57 ("receiving designated character strings for the primary computer via the communication network"); *id.*, 13:42-48 ("Generally, the central server 450 communicates with a large network of content servers . . . each content server can be provided with updated destination addresses and corresponding key words or phrases (e.g., character strings) which provide a link to the destination address."); *id.*, 21:4-11 ("destination addresses [] are transmitted from central server 450 to content server 410 and [] other content servers"); *id.* 23:5-15 ("character string received from content server"; "destination addresses [from central computer] transmitted to content server at box 720"); D.I. 50-1 at 3:52-55 (system maintains and transmits hit count data from content server to central server), 8:4-7 (receiving on central computer hit count data from primary computers via communication network)

[19] *See also* D.I. 50-2, claim 9 ("transmitting . . . *to primary computers* via a communication network" and "receiving . . . *from primary computers* via a communication network").

[20] '074 claim 9 recites "assigning means associated with said central computer for assigning at least one corresponding destination address to each of said linkable character strings."

requests for and retrieval of destination addresses for character strings that do not initially have matching entries on content servers (or are expired). (*See id.*, 11:5-9, 12:6-27, 12-13:44-2, 21-22:54-4, 22:65-24, Figs. 6-7.) And, to handle such requests on the central server, new destination addresses can be associated to character strings in its database and designated with a preferred status by an administrator input on a pay basis. (*Id.*, 13-14:49-20, 11:40-67.) Or, "when the destination addresses are not pre-assigned, a search engine [linked to a central server] searches a computer network such as the Internet using a particular character string [or related phrases] as a search term to obtain one or more candidate destination addresses." (*Id.*, 12:6-27; 18-19:51-7.) For such destination addresses (whether preferred or a search result), assignment or association with character strings on a central server's master destination database can be accomplished "using relational database techniques, such as [] SQL." (*Id.*, 15:18-28.) Given this, one of ordinary skill in the art would understand that the patent adequately discloses the structure and algorithm for associating destination addresses and character strings on the central server. (Taylor Decl., ¶¶ 97-104; Ex. C.)

### l.     "record keeping means"

The function recited in claim 20 of the '065 patent is "maintaining hit count data relating to said plurality of character strings." This function is clearly linked to a computer programmed according to the algorithm disclosed in the specification. The patent illustrates an embodiment in which a "record keeping" module (545) is within a content server and explains that the Dynamic Decision Filter™ executed on that server updates hit count data for matching character strings. (*See* Fig. 5; D.I. 50-2 at 11:6-15, 21:12-28, 21-22:62-27.) In fact, the methodology for maintaining such hit count data is outlined with respect to Figs. 6 and 7. The Dynamic Decision Filter™, which can be implemented as a PERL script, finds a fresh destination address for a given character string on a local or central database and, upon finding a match, increments an associated hit count. (*Id.*, 21-22:62-27 ("At box 615, if a fresh destination address is found, a hit count is updated at box 620, and the destination address (such as a URL) is transmitted to the

Web surfer's browser at box 625."); *see also id.*, 22-23:66-4, 23:12-15, 23:25-26.)[21]  Based on these disclosures, one of ordinary skill in the art would understand what steps are required and when such steps should be executed on the system servers to maintain and update hit count data in the system databases.  (*See* Taylor Decl., ¶¶ 105-109.)

### 7.    The Remaining Claim Terms Do Not Require Construction

The additional 28 terms that Vibrant Media seeks to construe do not require a construction beyond their plain and ordinary meaning.  D.I. 50 at 3-6, 8-9, 11-12, 16, 19-21; *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009); *Lucent Techs., Inc. v. Extreme Networks, Inc.*, 367 F. Supp. 2d 649, 653 (D. Del. 2005), *citing Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001).  Indeed, as evident in Vibrant Media's narrowing proposals for each, the plain and ordinary meaning should govern as many of its constructions parrot the claim language and/or improperly import limitations from the specification to bolster its infringement position.  For instance, for each and every method step in claims 28, 33-35 and 39, Vibrant Media's proposed constructions improperly add "by the primary computer" to the claim language.  *See, e.g.*, D.I. 50 at 19-21; Ex. D; *Andersen Corp. v. Fiber Composites, LLC,* 474 F.3d 1361, 1373 (Fed. Cir. 2007) (noting that a construction should not "import[] limitation from the specification into the claims absent a clear disclaimer of claim scope.").  The Court should not reward such unsupported tactics.

## V.    CONCLUSION

For the foregoing reasons, GE respectfully requests that the Court adopt its proposed constructions for the claim terms at issue in the Patents-In-Suit.

---

[21] If the destination address retrieved from a local database is not fresh, then a fresh one is requested from a central server.  The resulting address is updated on the requesting content server's database along with hit count data.  (D.I. 50-2 at 22:28-41.)  The hit count data can also be downloaded to a central server intermittently.  (*Id.*, 21:12-28.)

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Matthew W. Wolf
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
(202) 942-5000

Nicholas H. Lee
ARNOLD & PORTER LLP
777 South Figueroa Street, Forty-Fourth Floor
Los Angeles, California 90017-5844
(202) 243-4000

Date: June 14, 2013
1110795

By: */s/ Philip A. Rovner*
    Philip A. Rovner (No. 3215)
    Jonathan A. Choa (No. 5319)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    (302) 984-6000
    *provner@potteranderson.com*
    *jchoa@potteranderson.com*

*Attorneys for Plaintiff General Electric Company.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on June 14, 2013, the within document was filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorneys of record that the document has been filed and is available for viewing and downloading.

I further certify that on June 14, 2013, the within document was served as follows

## BY E-MAIL

Adam W. Poff, Esq.
Monté T. Squire, Esq.
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
apoff@ycst.com
msquire@ycst.com

Matthew B. Lowrie, Esq.
Kevin M. Littman, Esq.
Foley & Lardner LLP
111 Huntington Avenue, Suite 2600
Boston, MA 02199-7610
klittman@foley.com
mlowrie@foley.com

*/s/ Philip A. Rovner*
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
provner@potteranderson.com